Opinion for the court in part filed by Circuit Judge LOURIE, in which Chief Judge RADER and Circuit Judges NEWMAN, BRYSON, and PROST join in full, and in which Circuit Judge LINN joins in part II.
Opinion filed by Circuit Judge DYK, dissenting in part, in which Circuit Judges GAJARSA, REYNA, and WALLACH join in full, and in which Circuit Judge LINN joins in parts I — II.
LOURIE, Circuit Judge.
Defendant-Appellant HemCon, Inc. (“HemCon”) appeals from a judgment of the United States District Court for the District of New Hampshire holding that HemCon infringed U.S. Patent 6,864,245 (“the '245 patent”) assigned to PlaintiffAppellee Marine Polymer Technologies, Inc. (“Marine Polymer”). On September 26, 2011, a panel of this court reversed the district court’s decision, concluding that HemCon had acquired intervening rights in the '245 patent based on actions taken by Marine Polymer during a parallel reexamination proceeding. Marine Polymer Techs., Inc. v. HemCon, Inc., 659 F.3d 1084 (Fed.Cir.2011) (“Panel Opinion”), vacated, — FedAppx. -, 2012 WL 255331 (Fed.Cir. Jan. 20, 2012). Upon reconsideration en banc, we affirm the judgment of the district court by an equally divided court. Although the district court did not have the reexamination before it or decide the effect of that issue on its decision, we also consider HemCon’s arguments with respect to the reexamination and a majority of this court concludes as an alternative ground for affirmance that intervening rights do not apply to claims that have not been amended and are not new.
Background
Marine Polymer owns the '245 patent, which discloses and claims preparations of poly-p-l->4-N-acetylglucosamine (“pGlcNAc”), a naturally occurring polysaccharide polymer produced by organisms such as arthropods, fungi, and microalgae. Purified p-GlcNAc has utility in various industrial, pharmaceutical, and bio-medical applications. For example, p-GlcNAc promotes hemostasis (i.e., stoppage of bleeding or hemorrhage) and is therefore useful in trauma units for treating serious wounds.
The '245 patent places particular emphasis on “biocompatible” compositions of p-GlcNAc. In this context, biocompatibility relates to a compound’s biological reactivity or tendency to elicit deleterious reactions — e.g., necrosis, erythema, edema, cellular degeneration-upon exposure to living cells or tissues. E.g., '245 patent col.42 ll.36-38, col.44 ll.15-16. The specification describes four tests that can be used to assess the biocompatibility of a substance: an elution test, an implantation test, an intracutaneous injection test, and a systemic injection test. Id. col.42 ll.1-3. *1355 The disclosed elution test involves exposing a test substance to a solution to create an extract, exposing cultured test cells to the extract, and then observing the cells for signs of cytotoxicity. See id. col.42 11.6-62. The implantation test involves implanting a sample of the test substance into an animal’s muscle tissue and scoring the severity of any adverse local reactions. See id. col.42 1.64 — col.43 1.64. The intracutaneous injection test calls for preparing an extract of the test substance, injecting small volumes of the extract into the skin of an animal, and monitoring the injection sites for reactivity. See id. col.43 1.65— col.44 1.56. Finally, in the systemic injection test, animals are monitored for weight changes and other overt signs of toxicity after receiving intravenous or intraperitoneal injections of a test substance extract. See id. col.44 1.57 — col.45 1.42.
In describing these biocompatibility tests, the specification indicates that their requirements are met if a given test substance shows no more than mild or slight reactivity. For example, scores on the elution test range from zero to four on a scale of biological reactivity, where zero represents no reactivity, one represents slight reactivity, two represents mild reactivity, and three or four represent moderate or severe reactivity, respectively, and a substance can satisfy the elution test “if none of the cultures treated with the test article show a greater than mild reactivity.” Id. col.42 11.41-62. But with regard to the claimed p-GlcNAc compositions, the specification also states that “the pGlcNAc of the invention exhibits no detectable biological reactivity, as assayed by elution tests, intramuscular implantation in rabbits, intracutaneous injection in rabbits, and systemic injections in mice.” Id. col.41 1.66 — col.42 1.3; see also col.45 1.44 — col.49 1.66 (reporting biocompatibility test results for p-GlcNAc showing zero reactivity on each test).
The '245 patent issued with 22 claims, all of which recite “biocompatible” compositions of p-GlcNAc. A majority of those claims recite the “biocompatible” limitation generically. Independent claim 6 is representative:
A biocompatible poly-(3-l->4-N-acetylglucosamine comprising up to about 150,000 N-acetylglucosamine monosaccharides covalently attached in a p-l->4 conformation and having a molecular weight of up to about 30 million daltons in which at least one N-acetylglucosamine monosaccharide has been deacetylated.
Id. col.72 11.5-10 (emphasis added). In addition, the '245 patent contains several dependent claims that recite specific scores on the elution test. For example, claim 12 claims: “The biocompatible polyp-l->4-N-acetylglucosamine of any one of claims 6-11 which has an elution test score of 0.” Id. col.72 11.33-35 (emphasis added). Claims 3 and 20 also specify zero scores on the elution test; analogous claims 4, 5, 13, 14, 21, and 22 require elution test scores of one or two. E.g., id. col.72 11.33-41.
Marine Polymer sued HemCon in March 2006, alleging that HemCon infringed the '245 patent. During subsequent Mark-man proceedings, Marine Polymer argued that “biocompatible” p-GlcNAc should be construed to mean “biomedically pure [pGlcNAc] that reproducibly exhibits acceptably low levels of adverse bioreactivity, as determined by biocompatibility tests.” Marine Polymer Techs., Inc. v. HemCon, Inc., No. 06-CV-100, 2008 WL 1995454, at *1 (D.N.H. May 6, 2008). HemCon countered that “biocompatible” should be read as limiting the claims to p-GlcNAc that had been “harvested from plant microalgae,” or, in the alternative, should be interpreted broadly to mean “suited for biomedical applications.” Id. at *1-2. The district court considered, and ulti *1356 mately rejected, each of the parties’ proposed constructions after reviewing the '245 patent’s claim language, written description, and prosecution history. Instead, the district court concluded that “biocompatible” p-GlcNAc, as claimed in the '245 patent, means p-GlcNAc “with low variability, high purity, and no detectable biological reactivity as determined by bio-compatibility tests.” Id. at *10.
Marine Polymer then moved for summary judgment that HemCon literally infringed claims 6, 7, 10-12, 17, and 20 of the '245 patent. Applying its claim construction, the district court granted Marine Polymer’s motion and held that Hem-Con had infringed all seven asserted claims. A jury trial followed to determine validity and damages. The jury made factual findings relating to obviousness and determined that the '245 patent was not anticipated by the cited prior art. With respect to damages, the jury found that Marine Polymer was entitled to a reasonable royalty of $29,410,246. After the jury verdict, HemCon filed motions for judgment as a matter of law (“JMOL”) on anticipation, on the jury’s factual findings relating to obviousness, and challenging the damages award as not supported by substantial evidence. The district court denied each of the motions and made a further legal determination that the asserted claims were not obvious under 35 U.S.C. § 103. The district court entered a permanent injunction on September 16, 2010, barring HemCon from further infringement of the asserted claims, and issued its final judgment on September 22, 2010. HemCon appealed the decision to this court.
In August 2009, while the infringement litigation was still before the district court, HemCon filed a request for ex parte reexamination of the '245 patent in the United States Patent and Trademark Office (“PTO”). HemCon’s reexamination request cited ten prior art references — all of which, according to HemCon, raised substantial new questions of patentability for the '245 patent given the construction of “biocompatible” adopted by the district court. J.A. 40740-41. In response, the PTO granted HemCon’s reexamination request, initiated reexamination proceedings, and issued a non-final office action on April 1, 2010.[3] In this first office action, the examiner adopted a construction of “bio-compatible” different from the district court’s, concluding that under its broadest reasonable interpretation, the term meant “low variability, high purity, and little or no detectable reactivity.” J.A. 39503 (emphasis added). Noting that dependent claims 4, 5, 13, 14, 21, and 22 of the '245 patent required elution test scores of one or two (corresponding to slight or mild reactivity on that test as defined in the specification), the examiner explained that the district court’s construction requiring “no detectable biological reactivity” conflicted with those claims, while his interpretation avoided such inconsistency. The examiner then rejected all of the original 22 claims as invalid under his broader construction in light of the cited prior art. In so doing, he relied primarily on three prior art references — a scientific article (Sandford) and two patents (Peniston and Malette) — finding that each reference explicitly disclosed nearly all of the limitations of every claim. With respect to the “biocompatible” limitation, the examiner explained that any difference between the claimed biocompatibility and that disclosed by Sandford, Peniston, and Malette was “minor” and would have been obvious to a person of ordinary skill in the art at the *1357 time of the invention. J.A. 39507; see also 39517, 39522.
In response, Marine Polymer addressed “the improper dependency noted by the Examiner” by cancelling all six claims that had recited elution test scores of one or two (ie., claims that expressly required at least some reactivity), while leaving each of the remaining claims 1-3, 6-12, and 15-20 unaltered. Having deleted the inconsistent claims, Marine Polymer argued that “the [district court’s] interpretation of the term ‘biocompatible’ should be adopted in this reexamination” in view of various consistent teachings within the specification. J.A. 37688-90. With all conflicting claims cancelled, the examiner “agree[d] with the [district] court’s construction of the term biocompatible as derived from the specification of the ... '245 patent.” J.A. 39481. Furthermore, the examiner withdrew all rejections in view of that narrower construction and confirmed the remaining claims as patentable. Id.
The PTO did not provide notice of its intent to issue a reexamination certificate for the '245 patent until November 3, 2010, after the district court had entered final judgment in Marine Polymer’s infringement action. HemCon timely appealed from the district court’s judgment, and on November 18, 2010, a motions panel of this court granted a stay of the damages award and permanent injunction pending appeal. On March 29, 2011, the PTO issued the final reexamination certificate (“'245 Reexam. Cert.”), which cancelled dependent claims 4, 5, 13, 14, 21, and 22 and confirmed the patentability of claims 1-3, 6-12, and 15-20 in accordance with the examiner’s decision. '245 Reexam. Cert, col.2 11.1-6.
A panel of this court heard oral arguments in HemCon’s appeal from the district court’s judgment on June 7, 2011, and issued a decision on September 26, 2011, in which a majority reversed the district court’s judgment on infringement and vacated the injunction and the damages award on grounds that HemCon had acquired intervening rights during reexamination of the '245 patent. Panel Opinion, 659 F.3d at 1090-95. Marine Polymer petitioned for en banc rehearing, and on January 20, 2012, the full court granted Marine Polymer’s petition for rehearing and vacated the judgment of the panel. Marine Polymer Techs., Inc. v. HemCon, Inc., No.2010-1548, —Fed.Appx.-, 2012 WL 255331 (Fed.Cir. Jan. 20, 2012). For the reasons described below, we now affirm the judgment of the district court.
Discussion
I.

The District Court’s Decision

A. Jurisdiction and Standards of Review
We have jurisdiction to entertain this appeal under 28 U.S.C. § 1295(a)(1). We address claim construction as a matter of law, which we review without formal deference on appeal, although we give respect to the judgments of the district courts. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc). We review grants of summary judgment de novo, reapplying the same standard applied by the district court under Federal Rule of Civil Procedure 56(a). Iovate Health Seis., Inc. v. Bio-Engineered Supplements & Nutrition, Inc., 586 F.3d 1376, 1380 (Fed.Cir.2009). Our review of a district court’s denial of JMOL is governed by regional circuit law, Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co., 425 F.3d 1366,1372 (Fed.Cir. 2005), and the First Circuit reviews a district court’s denial of JMOL de novo, Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 13 (1st Cir.2009). In such situations, “a jury’s verdict must be upheld unless the facts and inferences, viewed in *1358 the light most favorable to the verdict, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have reached the verdict.” Id. (quoting Borges Colon v. Roman-Abreu, 438 F.3d 1, 14 (1st Cir.2006)). In reviewing a district court’s denial of JMOL on damages, the First Circuit reverses only where “reasonable persons could not have reached the conclusion that the jury embraced.” Visible Sys. Corp. v. Unisys Corp., 551 F.3d 65, 74 (1st Cir.2008) (quoting Attrezzi LLC v. Maytag Corp., 436 F.3d 32, 37 (1st Cir.2006)). Statutory interpretation is a matter of law that we consider de novo. Aristocrat Techs. Austl. Pty Ltd. v. Int’l Game Tech., 543 F.3d 657, 660 (Fed.Cir.2008).
B. Claim Construction
HemCon argues that the district court’s construction of “biocompatible” to mean “low variability, high purity, and no detectable biological reactivity as determined by biocompatibility tests” was erroneous and warrants reversal of the judgment. In supporting this assertion, HemCon relies primarily on the presence of the six dependent claims in the original '245 patent (eventually cancelled in reexamination) that required elution test scores of one or two, as well as passages in the written description characterizing certain biocompatibility tests as being satisfied despite detectable bioreactivity. HemCon therefore proposes a broader alternative construction, “suitable for biomedical applications,” that it argues would better align with the teachings in the specification and render the asserted claims invalid.
We disagree. The district court’s interpretation of “biocompatible” is supported by intrinsic evidence, and we therefore uphold that construction. Our claim construction analysis begins with the language of the claim itself, as it would have been understood by a person of ordinary skill in the art at the time of the invention. Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed.Cir.2005) (en banc) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.Cir. 1996) (“we look to the words of the claims themselves ... to define the scope of the patented invention”)). Faced with widely varying proposed definitions from the parties, the district court did not find that “biocompatible” had a plain and ordinary meaning to one skilled in the art. The district court properly looked first to the claims of the '245 patent and determined that they “do not define ‘biocompatible.’ ” Marine Polymer, 2008 WL 1995454, at *3.
Although several of the dependent claims specify that the “biocompatible” pGlcNAc may exhibit mild reactivity in an elution test (i.e., “an elution test score of 1” or “an elution test score of 2”), the majority of the claims use the term “bio-compatible” generically, without any reference to a biocompatibility test score. Because the term “biocompatible” admits of no limitation based on the context of the claims, the district court properly turned to the teachings of the specification.
The specification teaches that the pGlcNAc “of the invention” has “a high degree of biocompatibility” and directs the reader to a portion of the specification that “demonstrates the high biocompatibility of the p-GlcNAc of the invention.” '245 patent col.10 ll.49-62. Further, the cited material provides empirical test results showing that the p-GlcNAc of the invention exhibited zero reactivity on each disclosed bio-compatibility test, id. col.45 ll.45-50, col.46 ll.10-11 and 66-67, col.49 11.26-29, and summarizes the results as follows: “[I]t is demonstrated that the p-GlcNAc of the invention exhibits no detectable biological reactivity, as assayed by elution tests, intramuscular implantation in rabbits, intracutaneous injection in rabbits, and system *1359 ic injections in mice.” Id. col.411.66-col.42 1.3. Thus, the specification supports the district court’s claim construction. See, e.g., Netcraft Corp. v. eBay, Inc., 549 F.3d 1394, 1398 (Fed.Cir.2008) (“[T]he common specification’s repeated use of the phrase ‘the present invention’ describes the invention as a whole.... ”); Verizon Servs. Corp. v. Vonage Holdings Corp., 503 F.3d 1295, 1308 (Fed.Cir.2007) (“When a patent thus describes the features of the ‘present invention’ as a whole, this description limits the scope of the invention.”); Honeywell Int’l, Inc. v. ITT Indus., Inc., 452 F.3d 1312, 1318 (Fed.Cir.2006) (limiting claims to a fuel filter where “the written description refers to the fuel filter as ‘this invention’ or ‘the present invention’ ”).[4]
HemCon’s arguments highlighting an inconsistency between the district court’s construction and the claims requiring non-zero elution test scores, while not baseless, essentially amount to a conflict between teachings in the specification and the doctrine of claim differentiation. As we have held, claim differentiation is “not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history.” Seachange Int’l, Inc. v. C-COR, Inc., 413 F.3d 1361, 1369 (Fed.Cir.2005); see also Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1538 (Fed.Cir.1991) (“Claim differentiation is a guide, not a rigid rule.”). Such description appears in the specification here, as indicated above.
We also find HemCon’s focus on the possibility of nonzero “passing” scores on the disclosed biocompatibility tests unpersuasive. In describing “Materials and Methods” for the four disclosed biocompatibility tests, the specification indicates that, for example, test substances may “meet[] the biocompatibility test if none ... show a greater than mild reactivity.” '245 patent col.42 11.42-44. But such language appears only in generalized descriptions of these test methods; when read as a whole, the specification makes clear that the p-GlcNAc of the invention outperforms baseline standards and shows “no detectable biological reactivity as determined by biocompatibility tests.” The district court’s construction of “biocompatible” as meaning p-GlcNAc “with low variability, high purity, and no detectable biological reactivity as determined by biocompatibility tests” is therefore affirmed by an equally divided court.[5]
C. Infringement
Following its decision on claim construction, the district court ruled on summary judgment that HemCon infringed claims 6, 7, 10-12, 17, and 20 of the '245 patent. On appeal, HemCon’s noninfringement challenge regarding claims 6, 7, 10,11, and 17 hinges entirely on its failed claim construction arguments, and HemCon does not otherwise dispute its infringement of these claims. With regard to claims 12 and 20, HemCon raises an additional defense, arguing that the district court lacked sufficient evidence to establish literal infringement because HemCon’s products allegedly cannot undergo elution test *1360 ing as required by those claims. However, HemCon has waived that argument by failing to raise it in opposing summary judgment, and we therefore need not consider it here. Pandrol USA, LP v. Air-boss Ry. Prods., Inc., 320 F.3d 1354, 1366-67 (Fed.Cir.2003). Accordingly, we affirm the district court’s judgment regarding infringement of claims 6, 7, 10-12, 17, and 20 by an equally divided court.
D. Damages
Finally, HemCon seeks to overturn the jury’s award of $29,410,246 in damages as unreasonable and not supported by substantial evidence. Specifically, HemCon argues that Marine Polymer’s expert lacked a sufficient basis for his testimony on what would constitute a reasonable royalty rate and that the jury improperly relied on the entire market value for its damages calculation. During trial, both parties presented expert testimony on damages. Marine Polymer’s expert testified that, based on his evaluation of the case, a reasonable royalty would range from about 26-34% of HemCon’s infringing sales, and he settled on 30%, or $29,410,246, as the appropriate award. In contrast, HemCon’s expert testified that 2-4% of all infringing sales represented the correct range, concluding that Marine Polymer’s reasonable royalties would total $2,767,589.
Both experts used the total sales of the accused products containing the infringing biocompatible p-GleNAc as the royalty base. The use of the entire market value as the royalty base is acceptable to the extent that the patent owner proves that “the patent-related feature is the basis for customer demand.” Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1336 (Fed.Cir.2009) (internal quotations omitted). The district court correctly found that the record contains substantial evidence to support a damages award based on the entire market value of HemCon’s infringing products, including “evidence pertaining to the importance of biocompatible p-GlcNAc in HemCon’s products and its significance for market demand.” Marine Polymer Techs., Inc. v. HemCon, Inc., No. 06-CV-100, 2010 WL 3070201, at *4 (D.N.H. Aug. 3, 2010).
Ultimately, the jury was entitled to evaluate this conflicting evidence and credit the testimony of Marine Polymer’s expert over that of HemCon, as it did. The jury also heard testimony from witnesses for both parties, including HemCon’s own president, describing the claimed pGlcNAc as “critical” to the core hemostatic function of the accused products. In sum, based on the evidence of record, the jury’s damages award was supported by substantial evidence. In such cases, we may not “substitute [our] choice for that of the jury.” Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1580 (Fed. Cir.1992). The damages award is therefore affirmed by an equally divided court.
II.

Intervening Rights

In addition, HemCon argues that the asserted claims of the '245 patent changed in scope during reexamination, HemCon thereby acquired intervening rights in those claims, and the district court’s finding of infringement should therefore be reversed. To support its intervening rights defense, HemCon asserts that the district court’s interpretation of “biocompatible” incorrectly narrowed the term by requiring “no detectable biological reactivity.” According to HemCon, the district court’s construction conflicts not only with statements in the written description, but also with the presence of dependent claims reciting elution test scores of one or two— claims that permit slight or mild reactivity and were in the original version of the '245 patent that was before the district court. *1361 HemCon contends that “biocompatible,” at least as represented in the '245 patent before reexamination, therefore must have encompassed low, non-zero levels of bioreactivity, so that the proper construction at that time was necessarily broader than the district court’s interpretation.
Next, HemCon argues that, by cancel-ling dependent claims 4, 5, 13, 14, 21, and 22 and persuading the examiner to adopt the district court’s construction of “biocompatible” during reexamination, Marine Polymer effected a substantive change in the scope of each remaining claim — essentially, from allowing some reactivity in the originally issued claims to permitting “no detectable biological reactivity” after reexamination. Citing our decision in Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1346-47 (Fed.Cir.1998), HemCon argues that the key to intervening rights lies in determining “whether the scope of the reexamined claims differs from the original claims.” Corrected Br. for Defendant-Appellant at 37, 2010 WL 5650491. HemCon thus concludes that this perceived “substantive change” to the surviving claims of the '245 patent during reexamination triggered intervening rights with respect to those claims. Under HemCon’s view, substantive change applies especially to claims 6, 7, 10, 11, and 17, which, reciting no numerical result in any biocompatibility test, are generic in that respect. Furthermore, HemCon argues that even claims 12 and 20 were substantially changed in scope when the examiner adopted the district court’s construction of “biocompatible” during reexamination, despite the fact that those claims have at all times required an elution test score of zero (corresponding to “no signs of cellular reactivity” on that test, '245 patent col.42 11.39-40). HemCon argues that while claims 12 and 20 specified no reactivity on the elution test prior to reexamination, they nevertheless covered products exhibiting slight reactivity on other biocompatibility tests until Marine Polymer successfully pressed the more restrictive “no detectable biological reactivity” construction during reexamination.[6]
Marine Polymer disagrees and argues that intervening rights cannot apply with respect to claims that have not been amended or newly introduced in the reexamination proceeding.[7]
The doctrine of intervening rights first developed as courts recognized that permitting substantive changes to the scope of patent claims through post-issuance procedures left “the door ... open for gross injustice” where a third party, having already begun to make, use, or sell a given article, finds its previously lawful activities rendered newly infringing under a modified patent. See Sontag Chain Stores Co. v. Nat’l Nut Co., 310 U.S. 281, 293-95, 60 S.Ct. 961, 84 L.Ed. 1204 (1940). In such situations, the defendant “acquired at least a right to continue to use the [articles] as if it held a license therefor under the reissued patent.” Id. at 294-95, 60 S.Ct. 961 (quoting Ashland Fire Brick Co. v. Gen. Refractories Co., 27 F.2d 744, 746 (6th Cir.1928)). With respect to reissued patents, the concept of intervening rights was codified by the Patent Act of 1952, and the statute provides for two types of intervening rights: (1) intervening
*1362 rights that abrogate liability for infringing claims added to or modified from the original patent if the accused products were made or used before the reissue, often referred to as absolute intervening rights; and (2) intervening rights that apply as a matter of judicial discretion to mitigate liability for infringing such claims even as to products made or used after the reissue if the accused infringer made substantial preparations for the infringing activities prior to reissue, often referred to as equitable intervening rights. See 35 U.S.C. § 252 (2006). Intervening rights do not accrue, however, where the accused product or activity infringes a claim that existed in the original patent and remains “without substantive change” after reissue. Seattle Box Co. v. Indus. Crating & Packing, Inc., 731 F.2d 818, 827-28 (Fed.Cir. 1984).
Although intervening rights originated as a defense against patents modified through reissue procedures, the doctrine has since been extended to the context of patent reexamination. Pursuant to 35 U.S.C. §§ 307(b) and 316(b), respectively, both ex parte and inter partes reexaminations can give rise to intervening rights. For example, § 307(b) provides as follows:
Any proposed amended or new claim determined to be patentable and incorporated into a patent following a reexamination proceeding will have the same effect as that specified in section 252 of this title for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim, or who made substantial preparation for the same, prior to issuance of a certificate under the provisions of subsection (a) of this section.
35 U.S.C. § 307(b) (emphasis added).[8] Thus, after a patent emerges from reexamination, the statute makes available absolute and equitable intervening rights to the same extent provided in the reissue statute, but only with respect to “amended or new” claims in the reexamined patent.
With regard to HemCon’s intervening rights argument, we must first note that the reexamination of the '245 patent was a separate and distinct proceeding that is not properly before us on appeal. It did not conclude until after trial, so the district court did not consider, nor could it have considered, the reexamination in rendering its judgment. The panel noted that the issue of intervening rights arose after the district court judgment, but concluded that it had the discretion to consider that issue on appeal because it was an event as to which judicial notice is appropriate. Exercising that discretion, the panel held that, in light of its reversal of the district court’s claim construction, HemCon is entitled to intervening rights and that the district court’s judgment of infringement therefore must be reversed.
Although we reject the premise of HemCon’s argument regarding intervening rights — that the district court’s claim construction prior to reexamination of the '245 patent was erroneous — we conclude, as an alternative ground for decision, that even if the district court’s claim construction was erroneous, HemCoris intervening *1363 rights argument must fail because it disregards the plain and unambiguous language of § 307(b). Section 307(b) governs intervening rights arising from ex parte reexamination and specifies that only “amended or new” claims incorporated into a patent during reexamination “will have the same effect as that specified in section 252,” ie., will be susceptible to intervening rights. HemCon ignores this threshold statutory requirement and asks that we proceed directly to the subsidiary “substantive change” analysis, which derives from § 252. See Kaufman Co. v. Lantech, Inc., 807 F.2d 970, 975-77 (Fed. Cir.1986) (explaining the relationship between §§ 252 and 307(b) and holding that “identical,” as used in § 252, means “without substantive change”). But under § 307(b), the first question when assessing whether intervening rights arose from a reexamination is whether the asserted claim is “amended or new”; if the answer is no, that ends the inquiry. Only if the claim at issue is new or has been amended may the court proceed to the second step in the analysis and assess the substantive effect of any such change pursuant to § 252.
Such a framework is consistent with our holding in Laitram. There, our focus rested on whether the claims had been substantively changed precisely because the claims had been changed — there was no question that the claims at issue had been amended in reexamination, so the dispute centered on the second step in the intervening rights analysis, viz., whether those literal amendments to the claim language had effected substantive changes in claim scope. See Laitram, 163 F.3d at 1344 (“The parties dispute whether the scope of the original claims was substantively changed following several amendments made during the reexamination of the ... patent.”) (emphasis added). In contrast, the patent claims asserted here against HemCon were neither “new” nor “amended” — claims 6, 7, 10-12, 17, and 20 contained identical language before and after reexamination. '245 patent col.72 11.5-16, 25-35, 50-54, 60-61; '245 Reexam. Cert, col.2 11.1-5. Whether or not Marine Polymer’s arguments to the examiner and cancellation of claims during reexamination may have affected the remaining claims’ effective scope, they did not “amend” those claims for intervening rights purposes or make them “new,” which is what the statutory language requires. Intervening rights are therefore unavailable under § 307(b) as a matter of law.
HemCon sidesteps this issue by emphasizing the well-recognized principle that arguments made during prosecution can affect the ultimate meaning of a claim term — and thus the “scope” of a claim— and then returning to its contention that intervening rights turn on whether claim scope changes during reexamination. HemCon thus posits that Marine Polymer’s actions in reexamination rendered the asserted claims effectively “amended” by disavowal or estoppel, even though the language of the claims was not formally changed. We disagree.
While it is true that claims are properly interpreted to account for arguments and concessions made during prosecution, HemCon’s conclusion that the claims asserted here were “amended” for purposes of § 307(b) goes too far. In general parlance, “amend” means “to alter ... formally by adding, deleting, or rephrasing.” American Heritage College Dictionary 42-43 (3d ed. 1997). And even if the term were ambiguous standing alone, any doubts are resolved by its context within § 307.
Section 307(a) identifies three categories of claims in a reexamined pat- *1364 ■ ent: (1) claims that existed in the original patent but have been cancelled as unpatentable, (2) claims that existed in the original patent and have been confirmed as patentable, and (3) amended or new claims that did not exist in the original patent but have been found to be patentable and will be incorporated into the patent by the PTO.[9] In providing for intervening rights, § 307(b) is limited to the third category of claims, as evidenced by its corresponding reference to any “amended or new claim” that is “incorporated into a patent.” Any interpretation of “amended” that includes disavowal or disclaimer by argument alone, as advocated by HemCon, would conflict with the rest of § 307, for it is difficult to envision how arguments about claim meaning could be “incorporated into a patent” by the Director of the PTO. Finally, it is clear that “amended” is a term of art in patent prosecution,[10] including reexamination proceedings,[11] and in that context connotes formal changes to the actual language of a claim. We thus cannot agree that a claim can be “amended” for purposes of § 307(b) without changing the claim language itself.
HemCon also expresses concern that excluding its concept of amendment by argument from the ambit of § 307(b) would “create a significant loophole” in the intervening rights defense — shrewd patentees would simply opt to rely on arguments rather than amendments to effectively change, and thereby preserve, otherwise invalid claims during reexamination without engendering intervening rights against those claims. Reply Br. for Defendant Appellant at 25, 2011WL 287045.
We believe that is highly unlikely. If, in reexamination, an examiner determines that particular claims are invalid and need amendment to be allowable, one would expect an examiner to require amendment rather than accept argument alone. Indeed, Congress may well have expected that changes in claim scope during reexamination would ordinarily be made by amendment, which would avoid the risk of creating a loophole in the intervening rights defense. Moreover, if an argument does suffice to overcome a rejection, it is probably because the claims at issue are not unallowable. Thus, the fear of gamesmanship does not persuade us to rule contrary to the plain meaning of the statute. Various amici have in fact pointed out that such gamesmanship concerns run both ways, suggesting that HemCon’s interpretation of § 307(b), if adopted, would invite putative infringers to initiate reexamination proceedings with marginal or noninvalidating prior art. Under HemCon’s rule, such a requestor could expect that, even if *1365 the reexamination ultimately confirms all claims as patentable without amendment, the patent owner will necessarily make substantive arguments in defending the claims, thereby allowing the requestor to allege intervening rights based on those arguments. In any event, we cannot and will not speculate about possible consequences with respect to situations not before us and which we cannot foresee.
The dissent criticizes our discussion of HemCon’s intervening rights defense at length, asserting that this important issue has been addressed only in dictum by the en banc court. However, because the original opinion dealt extensively with this issue, we must now decide the case as we find it and clarify the law.
Regarding the clause in § 807(b) restricting intervening rights to “amended or new” claims, the dissent relies heavily on analogy to other fields of law. While prior experience may at times be helpful in statutory interpretation, references to scattered permissive applications of the term “amended” to, e.g., a product safety regulation and a private contract, are of limited utility in interpreting the specific patent statute before us. Clear statutory language and the long understanding of practitioners in a field trump interpretations from other fields. Furthermore, the dissent selectively quotes from amicus briefs arguing for a flexible interpretation of the intervening rights statute, but other amici argue for giving the statutory language its plain meaning. Clearly, nothing conclusive can be gleaned from the amicus briefs, but we, in addition to relying primarily on our own analysis, are more persuaded by those arguing for a faithful reading of the statutory text.
The dissent makes a brief attempt to call upon the Supreme Court to support its view, but the quoted language of the Court was that a specification “be substantially changed, either by the addition of new matter or the omission of important particulars, so as to enlarge the scope of the invention as originally claimed.” Russell v. Dodge, 93 U.S. 460, 463-64, 23 L.Ed. 973 (1876). Such language does not control this case, which does not deal with the introduction of new matter or the omission of important particulars so as to enlarge the scope of the invention as originally claimed. The claims remaining in the patent are the same as originally claimed.
In sum, the plain directive of the governing statute before us does not permit HemCon to invoke intervening rights against claims that the PTO confirmed on reexamination to be patentable as originally issued. To be sure, patent applicants’ actions and arguments during prosecution, including prosecution in a reexamination proceeding, can affect the proper interpretation and effective scope of their claims. But in rejecting HemCon’s request for intervening rights, we are not here interpreting claims. Rather, we are interpreting a statute that provides for intervening rights following reexamination only as to “amended or new” claims. The asserted claims of the '245 patent are neither.
Conclusion
Accordingly, the final judgment of the district court is affirmed.
AFFIRMED

. Ex parte reexamination of the '245 patent was conducted under Reexamination Control No. 90/009,555.

. Judge Dyk's opinion argues the details of claim construction based on the assertion that neither party argued the construction arrived at by the district court. We are not bound by the arguments of the parties, however, and neither was the district court. Exxon Chem. Patents, Inc. v. Lubrizol Corp., 64 F.3d 1553, 1555 (Fed.Cir.1995). Moreover, Judge Dyk suggests that we are deciding claim construction based only on one example, to the exclusion of others. In fact there is only one example of the claimed p-GlcNAc in the specification; the rest of the cited "examples” provide various methods of purifying, characterizing, or using the disclosed product.

. We also note that, while not a basis for our affirmance, the PTO arrived at the same conclusion upon interpreting the term in its parallel reexamination proceeding.

. HemCon’s position is supported by amici curiae Hewlett-Packard Co., Broadcom Corp., Cisco Systems, Inc., Dell, Inc., eBay, Inc., Facebook, Inc., Google Inc., and SAP America, Inc.; and GEICO Corp., FedEx Corp., and Macy's, Inc.

. Marine Polymer’s position is supported by amici curiae Jan K. Voda; Intellectual Ventures Management LLC; the Biotechnology Industry Association and Pharmaceutical Research and Manufacturers of America; Soverain Software LLC and Tessera, Inc.; and Sealy Corp.

. Section 316(b), governing intervening rights available after inter partes reexamination, contains essentially identical language.

. The text of Section 307(a) reads as follows: In a reexamination proceeding under this chapter, when the time for appeal has expired or any appeal proceeding has terminated, the Director will issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable, confirming any claim of the patent determined to be patentable, and incorporating in the patent any proposed amended or new claim determined to be patentable. 35 U.S.C. § 307(a) (2006).

. See, e.g., 37 C.F.R. § 1.121(c) ("All claims being currently amended [shall] be submitted with markings to indicate the changes that have been made relative to the immediate prior version of the claims----[A]dded subject matter must be shown by underlining the added text.... [Djeleted matter must be shown by strike-through...."); id. § 1.114(c) (distinguishing between prosecution arguments and amendments to the specification, claims, or drawings).

. See, e.g., 37 C.F.R. § 1.530(d) ("A proposed amendment in an ex parte or an inter partes reexamination proceeding is made by filing a paper directing that proposed specified changes be made to the patent specification, including the claims, or to the drawings.”).