**MEADWESTVACO CORPORATION, et al., Plaintiffs,**

v.

**REXAM PLC, et al., Defendants.**

**Civil Action No. 1:10cv511.**

United States District Court, E.D. Virginia, Alexandria Division.

Aug. 17, 2011.

Thomas Glascock Slater, Jr., Shelley Low Spalding, Hunton & Williams LLP, Richmond, VA, Sona Rewari, Hunton & Williams, McLean, VA, for Plaintiffs.

Craig Crandall Reilly, Law Office of Craig C. Reilly, Alexandria, VA, Griffith Lowell Green, Scott Michael Border, Sidley Austin Brown & Wood LLP, Washington, DC, for Defendants.

*CLAIM CONSTRUCTION MEMORAN-
DUM OPINION AND ORDER*

LEE, District Judge.

THIS MATTER is before the Court for claim construction. (Dkt. No. 182, 189.) This case concerns a component of perfume fragrance packaging called the invisible dip tube, a tubing product that transports the fragrance from the bottle to the sprayer. The invisible dip tube virtually disappears when immersed in liquid.

The Court concludes that there are seven terms requiring claim construction because their constructions are necessary "to clarify and ... explain what the patentee covered by the claims[.]" *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed.Cir.1997). The Court holds that (1) the term "quenched" means "rapidly cooled"; (2) the term "transparency" means "allowing visible light through so that objects can be clearly seen through it"; (3) the term "dispenser assembly" means "an assembly that includes at least a transport assembly and a dip tube"; (4) the term "modified ethylene tetrafluoroethylene" means "an ethylene tetrafluoroethylene fluoropolymer that has been altered to change one or more properties of the composition"; (5) the term "about" means "approximately"; (6) the term "XRD crystallinity" means "crystallinity as measured by x-ray diffraction (XRD) using at least the XED characterization parameters identified in the '132 patent at column 4, line 66 to column 5, line 6"; and (7) the term "crystalline content" means "crystallinity as measured by x-ray diffraction (XRD) using at least the XRD characterization parameters in the '132 patent at column 4, line 66 to column 5, line 6." Each of these terms is discussed below.

## I. BACKGROUND

This case concerns Defendants Valois of America, Valois of France (collectively, "Valois"), Rexam PLC, and Rexam Beauty and Closure's (collectively, "Rexam") alleged infringement of U.S. Patent Number 7,718,132 ("the '132 patent") and U.S. Patent Number 7,722,819 ("the '819 patent") owned by Plaintiffs MeadWestvaco Calmar and MeadWestvaco Corporation (collectively, "MWV"). The patents relate to the invisible dip tube, the tube in a perfume bottle that disappears when immersed in liquid.

In 2005, Saint–Gobain Calmar ("Calmar"), MeadWestvaco Calmar's predecessor, asked its tube supplier, Saint–Gobain Performance Plastics, to investigate the creation of an invisible dip tube. James Thomson, Julia DiCorleto, John Boyle, and Kevin Gray (the "Inventors") worked on "Project Invisible," the project that eventually led to the invisible dip tube. (Pl.'s Mem. Partial Summ. J. 3–4 (hereinafter Pl. Mem.)). After investigating many materials, the Inventors focused on fluoropolymers, which offered the qualities necessary for constructing the invisible dip tube. (*Id.* at 4.) Fluoropolymers were thought by those skilled in the art to be carcinogenic, although this was a false belief. (*See id.* Exs. KK 42–43; LL 118; OO 41–42; UU; VV.)

On October 11, 2005, the Inventors filed a provisional patent covering fragrance products having an invisible dip tube. (*Id.*) The patent application identified the need in the art for concealing the dip tube to improve the overall aesthetic of the fragrance product. (*Id.*; Pl. Mem. Ex. A 1:22–45, 5:40–56.) To meet this need, the Inventors disclosed a fluoropolymer tube having high transparency, low crystallinity, and a refractive index nearly exactly that of perfume. (Pl. Mem. 4.) The Inventors distinguished their invention from previous tubes that were unable to meet the con-

cealment requirements for fragrance products.

In March 2006, Valois learned of the MWV invisible dip tube, and later issued its own tube in May 2007. In April 2006, Rexam's tube supplier successfully produced their first batch of dip tubes, which were identical to MWV's tubes. By this time, MWV's claimed invention had achieved acclaim, including a nomination for the "fragrance Oscars," an Innova Pack 2007 Award, and the Luxe Pack Brazil 2007 Award. (Pl. Mem. 10.) According to the Luxe Pack Brazil 2007 panel, "the dip tube has always been a problem for luxury perfumes ... [and] the invisible dip tube by Calmar[ ] has put an end to this problem." (*Id.*)

There are four independent claims at issue: claims 1, 9, and 15 of the '132 patent, and claim 1 of the '819 patent. Claim 1 of the '132 patent, which illustrates the terms at issue, provides for:

1. A fragrance product comprising:

a container containing liquid fragrance having a refractive index of about 1.37; and,

a dispenser assembly for dispensing the liquid fragrance comprising:

a transport assembly; and

a tube connected to the transport assembly and extending into the liquid fragrance, wherein the tube consists essentially of an extruded and quenched crystalline fluoropolymer having an XRD crystallinity not greater than about 13%, and the tube has a refractive index of from about 1.36 to about 1.38.

On February 14, 2011, Plaintiffs filed a claim construction brief. On March 4, 2011, Defendants supplied their own claim construction. These constructions are now before the Court.

## II. DISCUSSION

Claim construction is a question of law to be determined by the Court. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 391, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The court begins a claim construction analysis by considering the language of the claims themselves. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed.Cir.2005) (*en banc*). A claim term's meaning cannot be narrowed or limited by a particular embodiment described in a patent specification. *Liebel–Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 907 (Fed.Cir.2004); *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed.Cir.2002).

The words of the claim "are generally given their ordinary and customary meaning," which "is the meaning that term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips,* 415 F.3d at 1312–13 (internal quotation marks omitted). In addition, "claims must be read in view of the specification, of which they are a part." *Id.* at 1315 (internal quotation marks omitted). A court should also consider the prosecution history of the patent because it "provides evidence of how the [Patent Office] and the inventor understood the patent." *Id.* at 1317 (citations omitted). References before the United States Patent and Trade Office during patent prosecution are part of the intrinsic record. *V–Formation, Inc. v. Benetton Grp.,* 401 F.3d 1307, 1311 (Fed.Cir.2005). Lastly, courts may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Phillips,* 415 F.3d at 1322–23 (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d

1576, 1584 n. 6 (Fed.Cir.1996)) (internal quotation marks omitted).

## III. ANALYSIS

The Court construes the following seven terms found in both the '132 and '819 patents: (1) "quenched"; (2) "transparency"; (3) "dispenser assembly"; (4) "modified ethylene tetrafluoroethylene"; (5) "about"; (6) "crystalline content"; and (7) "XRD crystallinity." The construction of these seven terms is necessary "to clarify and ... explain what the patentee covered by the claims[.]" *U.S. Surgical Corp.*, 103 F.3d at 1568. Each term will be discussed in turn.

### A. "Quenched"

■ The Court adopts Plaintiffs' definition of "quenched," meaning "rapidly cooled." (*See* Pl. Ex. 12, McGraw–Hill Dictionary of Scientific and Technical Terms, 4th Ed. at 1538.)

The Court adopts this construction for three reasons. First, the definition of "rapidly cooled" is consistent with the ordinary and customary meaning of "quenched" by a person with ordinary skill in the art of plastics. This is the ordinary and customary meaning because the basic scientific dictionary defines the term "quenched" as "shock cooling by immersing liquid or molten material into a cooling medium (liquid or gas)." (*See* Pl. Ex. 12, McGraw–Hill Dictionary of Scientific and Technical Terms, 4th Ed. at 1538.) The Court understands that "shock cooling" is rapid cooling which can be accomplished by any cooling medium. Second, Plaintiffs' construction can be seamlessly substituted when read into the claims—the tube is made of "an extruded and *rapidly cooled* fluoropolymer." (*See* Pl. Ex. 1, 2 (emphasis added)). Finally, the extrinsic evidence provided during the patent prosecution dictates that "quench" be meant as rapid cooling in any medium because the Inventors' 2005 presentation distinguishes between "quenched," meaning rapidly cooled, and "annealed," meaning slowly cooled. (Pl. Cl. Construction Brief Ex. 17.) This suggests that those skilled in the art—the Inventors—understood "quenching" to mean "rapid cooling."

The Court rejects Valois' proposed construction. Valois claims that "quenched" should be construed as "a process by which a plastic tube is subjected to rapid cooling by immersion into a cooling liquid." While the Court agrees with "a process by which a plastic tube is subjected to rapid cooling by immersion,"[1] it dismisses any restriction on the cooling medium for six reasons. First, the claim itself does not restrict the cooling medium in any section. The claim provides for an "extruded and quenched" fluoropolymer, not an "extruded and water-quenched" fluoropolymer. Second, the dictionary definition of "quench" explains the use of either a liquid or gas cooling medium. Third, the Court may not use a specific embodiment to narrow a patent's claims. The patents' specifications mention a "quench tank" that rapidly cools the extrudate, but this specification cannot be used to interpret or limit the methods in which a tube may be quenched. Fourth, extrinsic evidence reveals that polymers may be "rapidly quenched" with "chilled air"; the prior art of record during the patent prosecution suggests the use of air as a quenching medium. (Pl. Cl. Construction Brief Ex. 12 at 6.) Finally, Defendant's own understanding of "quenching" meant "quick cool

---

1. The term "immersion" is immaterial because the tube can either be immersed in either air or water; the cooling medium restriction is the material argument set forth by Valois.

down of the tube, which is the definition of quenching." (Pl. Supplemental Opp'n Ex. 4.) Defendant's tube supplier, ABC Corporation,[2] testified that its definition of quenching was "rapid cooling," and that "the media did not dictate whether or not a material was quenched." (*Id.* Ex. 1 at 134:22–25; 136:1–4; 175:24–25.)

For all of the above reasons, the Court adopts Plaintiff's definition of "quenched," construing the term to mean "rapidly cooled."

### B. "Transparency"

■ The Court adopts the Cambridge Dictionary of American English's definition of the term "transparent," the adjective form of the word "transparency," which defines the term as "allowing visible light through so that objects can be clearly seen through it." (Pl. Cl. Construction Brief Ex. 19, Cambridge Dictionary of American English, http://dictionaries.cambridge.org/ (select "American English"; search "transparency")). The Court adopts this construction because (1) this is the ordinary and plain meaning of the term, and (2) the claims do not define the term in any other fashion. The Court rejects Defendant's construction, "a measurement of the percent transmission of light having a wavelength of 500 microns passing through a 3 mm thick sample," because such a construction would be narrowing the patents' claims through a specific embodiment. As established previously, the Court cannot limit claims to a specific embodiment description. The claims themselves have no restriction or definition of transparency. Hence, the Court defines "transparency" as "allowing visible light through so that objects can be clearly seen through it."

### C. "Dispenser Assembly"

■ The Court adopts Plaintiffs' construction of "dispenser assembly," meaning "an assembly that includes at least a transport assembly and a dip tube," because the claims expressly define "dispenser assembly." Claim 1 of both the '132 and '819 patents provide for a "dispenser assembly for dispensing the liquid fragrance comprising a transport assembly; and a tube . . . ." (Rexam Mot. Summ. J. Exs. 1, 2.) The Court rejects Defendants' construction, "a structure for distribution or dispensing of liquid or spray," because (1) this construction contradicts the plain meaning of the claims, and (2) the word "spray" does not appear in either patent. Accordingly, the Court construes "dispenser assembly" to mean "an assembly that includes at least a transport assembly and a dip tube."

### D. "Modified Ethylene Tetrafluoroethylene"

■ The Court adopts Plaintiffs' construction of "modified ethylene tetrafluoroethylene," meaning "an ethylene tetrafluoroethylene fluoropolymer that has been altered to change one or more properties of the composition," because the intrinsic record supports construing "modified" with its plain meaning of "altered." The plain meaning of "modify" is to alter. (*See* Pl. Ex. 22, American Heritage Dictionary of the English Language, 4th Ed. (defining modify as "to alter")). The claims do not define or limit how ethylene tetrafluoroethylene may be modified, suggesting that the conventional definition of the term—to alter or be altered—controls. The Court rejects Defendant Rexam's construction, "a copolymer of ethylene and tetrafluoroe-

---

**2.** The Court will use "ABC Corporation" in lieu of the tube manufacturer's real name in accordance with the Court's Motion to Seal.

thylene modified to include a third monomer," because such a construction limits and narrows the plain meaning of the term by including terms unused in the claims. The terms "copolymer" and "monomer" do not appear anywhere in the patents; to read such terms into the claim would be an improper narrowing. Hence, the Court construes "modified ethylene tetrafluoroethylene" to mean "an ethylene tetrafluoroethylene fluoropolymer that has been altered to change one or more properties of the composition."

### E. "About"

■ The Court adopts Plaintiffs' construction of the term "about," meaning "approximately," because this is the plain meaning of the term. Courts have widely accepted the meaning of "about" as "approximately." *See, e.g., Ortho–McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.,* 476 F.3d 1321, 1326 (Fed.Cir.2007) (agreement that "about" means "approximately"); *Merck & Co. v. Teva Pharm. USA, Inc.,* 395 F.3d 1364, 1372 (Fed.Cir. 2005) ("about" means "approximately"); *Conopco, Inc. v. May Dep't Stores Co.,* 46 F.3d 1556, 1561 n. 2 (Fed.Cir.1994) (dictionary definition of "about" is "approximately"). The Court rejects Defendant's varied, specific range constructions for "about" because (1) such a construction would be an unjustified, rigid narrowing of the terms, and (2) the claims themselves do not provide for any strict ranges on its various measurements. Hence, the Court construes "about" to mean "approximately."

### F. "Crystalline Content" and "XRD Crystallinity"

■ The Court adopts the parties' stipulated construction of "crystalline content" and "XRD crystallinity." (*See* Dkt. No. 181.) XRD crystallinity is defined as "crystallinity as measured by x-ray diffraction (XRD) using at least the XED characterization parameters identified in the '132 patent at column 4, line 66 to column 5, line 6." Crystalline content is defined as "crystallinity as measured by x-ray diffraction (XRD) using at least the XRD characterization parameters in the '132 patent at column 4, line 66 to column 5, line 6."

### IV. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that he parties' disputed terms and phrases are construed as follows:

(1) The term "quenched" means "rapidly cooled";

(2) The term "transparency" means "allowing visible light through so that objects can be clearly seen through it";

(3) The term "dispenser assembly" means "an assembly that includes at least a transport assembly and a dip tube";

(4) The term "modified ethylene tetrafluoroethylene" means "an ethylene tetrafluoroethylene fluoropolymer that has been altered to change one or more properties of the composition";

(5) The term "about" means "approximately";

(6) The term XRD crystallinity means "crystallinity as measured by x-ray diffraction (XRD) using at least the XED characterization parameters identified in the '132 patent at column 4, line 66 to column 5, line 6"; and

(7) The term crystalline content means "crystallinity as measured by x-ray diffraction (XRD) using at least the XRD characterization parameters in

the '132 patent at column 4, line 66 to column 5, line 6."